JOHN H. PARKER v. HASTINGS & CO.

(Decided December 23, 1898).

*Allegation—Proof—Issue—Negligence.*

Where a stream is found by the jury to be a "floatable" stream, and the complaint charges that the plaintiff's dam was injured by the defendant unlawfully and wilfully floating logs over the dam, there being no allegation of negligence on the part of defendant, an issue as to such negligence ought not to be submitted to the jury, nor found by them without proof.

MONTGOMERY, J , concurring in the conclusion that there ought to be a new trial, is doubtful whether the defendants' evidence sufficiently established in law and in fact, the *"floatability"* of the stream in question—the Canada prong of the Tuckaseigee river. *Commissioners* v. *Lumber Co* , 116 N. C., 750.

CIVIL ACTION to recover damages for injuries to plaintiff's mill, by defendants while floating logs in Tuckaseigee river, tried before *Norwood, J.*, and a jury, at Fall Term, 1897, of JACKSON Superior Court.

The complaint alleged: IV. That the defendants, on 1st day of December, 1892, and before and since said day, have, regardless of the plaintiff's rights, unlawfully and wilfully rolled and placed into said Tuckaseigee river large numbers of large logs, lumber and timber, and permitted and caused the same to be floated down and over said mill dam in such manner as to break down and destroy said dam, to the great damage of plaintiff, to-wit: $1,000.

The answer alleges : 2. That the Tuckaseigee river, at, above, and below the alleged location of the plaintiff's alleged dam, is a floatable stream, in fact and law, and is such and is now and has at all times heretofore been capable of being used for floating rafts, boats, logs, timbers and other products of the country to markets and mills lower down, and is now and has been at all

times heretofore in this respect a navigable and floatable stream and subject to the public use as a public highway; and as such public highway was and had been for a long period of time prior to the first day of December, 1892, used by all persons desiring to float rafts, boats, logs, timbers and other products of the country along its banks to markets and mills lower down.

Among the issues submitted by his Honor was: 4. At the time of the alleged injury was the Canada Fork of the Tuckaseigee river, at the point of the alleged injury such a stream, that business men may calculate that with tolerable regularity as to seasons the water will rise to and remain at such a height as will enable them to make it profitable to use it as a highway for transporting logs to markets or mills lower down?

The jury responded, Yes.

His Honor also submitted issue 6. Was said dam injured by the negligence of the defendants?

The defendants objected to this issue, on the ground that there was no negligence alleged in the complaint. Objection overruled; defendants excepted.

The jury responded, Yes.

The defendants objected not only to the submission of this issue to the jury, but also to the finding of the jury thereon, on the ground that there was no evidence of negligence. Objection overruled; defendant excepted.

Upon the question of negligence allegation and proof appear to be wanting.

The jury assessed the plaintiff's damages at $20.

Judgment accordingly. Appeal by defendant.

*Messrs. Moore & Moore*, and *W. E. Moore*, for defendants (appellants).

*Mr. W. T. Crawford*, for plaintiff.

PARKER *v.* HASTINGS.

CLARK, J.: This action was brought by the plaintiff against the defendants to recover damages which the plaintiff alleges that he had sustained by reason of the defendants having unlawfully and wilfully rolled and placed into Tuckasiegee River large numbers of logs, lumber and timber, and permitted and caused the same to be floated down against his mill dam, by which the dam was broken down and destroyed. The defence was that the stream was a floatable one and therefore a natural highway, and that the plaintiff's injury, if any he suffered, was without remedy, no negligence being alleged or proved.

The court submitted an issue as to whether the dam was injured by the negligence of the defendants, and instructed the jury that if they should find that the river was a floatable stream where the plaintiff's mill and dam were located, still the defendants would be liable if they negligently injured the plaintiff's dam in the floating of the logs. The defendants objected to the issue and excepted to the charge of his Honor upon it.

The issue should not have been submitted, for the complaint did not allege negligence on the part of the defendants, nor was there a scintilla of evidence that the defendants did anything except cut the logs and put them in the stream for floating down the river. The words unlawfully and wilfully mean simply that the act of cutting and putting the logs in the stream was contrary to the plaintiff's right and *intentionally* done. There must be a new trial of this case for that error.

New trial.

MONTGOMERY, J., concurring: I concur with the Court in the conclusion that there ought to be a new

123—43

PARKER v. HASTINGS.

trial in this case, and I desire to add, as my own views, on account of the serious public importance of the matter involved, that if the question had been raised in the trial below, in such a way as that the court, could take notice of it, I would be of the opinion that there was no sufficient testimony offered, such as a jury ought to consider—under the main issue submitted to warrant the finding of the jury in the affirmative. The issue to which I refer was in these words: "At the time of the alleged injury was the Canada Fork of the Tuckasiegee River, at the point of the alleged injury, such a stream that business men may calculate that, with tolerable regularity as to seasons, the water will rise to and remain at such a height as will enable them to make it profitable to use it as a highway for transporting logs to market or mills lower down?"

Justice Furches in his dissenting opinion, in *Commissioners* v. *Lumber Co.*, 116 N. C., 750, said that "Floatable water courses" was a term not known to our law until within the last six or eight years, and I think an examination of our decisions will verify the statement. The right to float logs at certain times of high water in a stream not navigable for craft of any kind at ordinary water, has been recognized by this Court; and the law in reference thereto has been formulated or rather announced under an oft repeated definition of a "floatable stream." That definition repeated in *Commissioners* v. *Lumber Co.*, *supra*, is as follows: "It is not necessary, in order to establish an easement in a river, to show that it is susceptible of use continuously during the whole year for the purpose of floatage; but it is sufficient if it appear that business men may calculate that, with tolerable regularity as to seasons, the water will rise to and remain at such a height as will enable them

to make it profitable to use it as a highway for transporting logs to mills or markets lower down."

The learned Judge (Avery) who wrote the opinion in
that case, of course made his definition from reading
and digesting the works of text writers and decisions of
the courts upon the subject. He quotes as authority
from Gould on Waters, where the writer says, "It is
not necessary that the stream, in order to be a highway,
should be capable of floating logs at all seasons of the
year, but its public character depends on its fitness to
answer the wants of those whose business requires its
use. If the stream is not always navigable, it must be
capable of floatage as the result of natural causes at periods recurring from year to year and continuing for a
sufficient length of time in each year to make it useful
as a highway." Mr. Gould cites the case of *Morgan* v.
*King*, 35 N. Y.,      to sustain his position, and in the
New York case will be found this announcement : "If
it (the stream) is ordinarily subject to periodical fluctuations in the volume and height of its water attributable
to natural causes and occurring as regularly as the seasons, and if its period of high water or navigable capacity ordinarily continues a sufficient length of time to
make it useful as a highway, it is subject to the public
easement." The principle of law then, which is announced in *Commissioners* v. *Lumber Co.*, *supra*, is the
same as that stated in Gould on Waters, and the same
as that announced in the case of *Morgan* v. *King*, *supra*.
Therefore, to make a stream such as I have described a
floatable one, the rises of water must be at recurring
seasons during each year with tolerable regularity.
They must not be produced by artificial means. They
must be habits of the stream produced by natural causes
to be known and to be anticipated, and upon which pru-

dent business men might make investments with a reasonable hope of returns. As was said in *Morgan* v. *King, supra,* "these periodical fluctuations must be attributable to natural causes and occur as regularly as the seasons." Sudden and irregular freshets, however high the water may become, will not make a stream a floatable one. If that were the rule, then every creek, if only a few yards wide, in moderately hilly sections, at times of sudden and unexpected heavy falls of rain, would become floatable streams with the result of the destruction of a large proportion of the milling and ginning properties of the State.

Now, have the defendants by their evidence brought themselves within the principles of law mentioned above? The evidence of the plaintiff tended to prove that there was no regularity in the rises of the river at periodic or recurring seasons of the year, and some of the witnesses said that sometimes years would elapse between rises sufficient to float logs. The strongest evidence of the defendants on the subject is as follows: T. H. Hastings said, "there were from three to eight or ten rises in the river each year that would float logs. There was a continuous tide in 1890 for six weeks that would have floated logs. There was a tide in November, 1891. We had some small tides in December, 1891. In 1892 we had tides in February and March, three tides, four tides. We had one in September that brought in a lot of logs. We had tides in 1893, one in July and a very large one in August." John Wike said, "I was raised near Tuckasiegee river and have known it all my life. Some years we have 3 to 4 tides a year; on the average we have 3 tides a year." M. F. Galloway testified that "some years there will be five or six freshets that will float logs; other years there will not be

more than one or two rises. The river will not carry the logs down without a freshet. It might be a year sometimes between the freshets. There was generally one or two freshets a year. You could not count with any certainty on the time of these freshets. The freshets were generally in the fall and spring." L. J. Smith testified, "I know the Tuckasiegee River; it will not float logs without a considerable rise. There are usually from four to five tides or rises a year sufficient to float logs. There might be a year that there would not be a freshet that would float logs. I think that the rises or tides can be counted upon with reasonable certainty." E. D. Davis said : "In common years there would be water enough to float logs three or four times a year—some years more and some years less. I could not count on regularity, but I could count on its coming along sometime during each year." Mrs. Annie L. Buffum, testified as follows: "I kept a weather report and diary in 1891, 1892, 1893, 1894 and 1895. (Witness read diary). Tide on January 22, 1891, 150 logs came into the boom. Tide February 1, 1891, 150 logs came into the boom. Tide February 9, 1891, the river rose six feet, the shore dam broke and a number of logs were lost. Tide November 10, 1891, (freshet) 5,000 logs came into the boom. Tide November 11, 1891, brought logs to boom. Tide November 3, 1891, fine freshet, logs coming. Tide December 3, 1891, fine freshet, 1,000 logs came into the boom. Tide December 7, 1891, logs came into boom. Tide January 13, 1892, freshet, logs came into boom. Tide January 14, 1892, water 7 inches above counters in stores. Freshet August 14, 1893, logs coming to boom. September 10, 1893, rise, logs coming to boom. September 12, 1893, boom broken. December 10, 1894, logs came. Dec. 12, 1894, logs came. April 7, 1895,

logs came, boom burst." She also testified that during portions of the years mentioned she was not at Dillsboro and did not keep her diary.

I am of the opinion that the evidence, in a just and reasonable view of it, was not sufficient to be submitted to the jury under the issue.